_____ FILED _____ ENTERED
_____ LODGED _____ RECEIVED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

APR 1 1 2019

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF | ) |
| SIX CELLULAR TELEPHONES | ) |
| FURTHER DESCRIBED IN ATTACHMENT | ) |
| A, CURRENTLY IN THE CUSTODY OF | ) |
| THE FEDERAL BUREAU OF | ) |
| INVESTIGATION IN BALTIMORE, | )  Misc. No. _19-1080-SAG_ |
| MARYLAND | ) |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Mark Neptune, a Task Force Officer with the Baltimore Police Department and the Federal Bureau of Investigation (FBI), being duly sworn, depose and state as follows:

1.      This affidavit is made in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search six cellular telephones, further described in this Affidavit and in Attachment A, that are currently in the custody of the FBI in Baltimore, Maryland (the "**SUBJECT DEVICES**").  Based on the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that the **SUBJECT DEVICES** contain evidence of distribution and possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841, and conspiracy to commit those offenses, in violation of 21 U.S.C. § 846.

2.      Based on my training and experience, I know that the **SUBJECT DEVICES** have been stored in a manner such that their contents are, to the extent material to this investigation, in substantially the same state as they were when the **SUBJECT DEVICES** first came into the possession of law enforcement. The applied-for warrant would authorize the forensic examination of the **SUBJECT DEVICES** for the purpose of identifying electronically stored data described more particularly in Attachment B.

3.      The information contained in this Affidavit is based upon my personal participation in this investigation, my training and experience, my review of documents and other evidence, and

information obtained from other law enforcement officers, witnesses, cooperating sources, and other individuals. All conversations and statements described in this Affidavit are related in substance and in part unless otherwise indicated.

4.      I submit this Affidavit for the limited purpose of establishing probable cause for the requested warrant, and this Affidavit does not set forth all my knowledge about this matter. I have not, however, excluded any information known to me that would defeat a determination of probable cause.

## AFFIANT BACKGROUND

5.      I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, the offenses enumerated in offenses enumerated in Section 2516 of Title 18, United States Code.

6.      I have been employed as a law enforcement officer with the Baltimore Police Department since September 2, 2008. I have been a Task Force Officer with the FBI since September 2015.   Since becoming a law enforcement officer, I have participated in numerous investigations of unlawful drug trafficking, and have conducted or participated in surveillances, the execution of search warrants, the recovery of substantial quantities of narcotics and narcotics paraphernalia, and the debriefing of informants and cooperating witnesses. I have also reviewed taped conversations, as well as documents and other records relating to narcotics trafficking and money laundering. In my career, I have made or participated in over one thousand arrests resulting in the seizure of suspected narcotics. I have also received over 130 hours of specialized training in the field of narcotics. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed; the methods of

payment for such drugs; the possession and use of firearms in connection with the trafficking of such drugs; and the manner in which narcotics traffickers store and conceal the proceeds of their illegal activities.

7.      During these investigations, I have examined records consisting in part of buyers' and sellers' lists, and pay/owe ledgers. I have conducted surveillance of numerous drug dealers. I have interviewed drug dealers, users and confidential informants and have discussed with them the life-style, appearance, and habits of drug dealers and users. I have become familiar with the manner in which narcotics traffickers smuggle, transport, store and distribute narcotics, as well as how they collect and launder drug proceeds. I am also familiar with the manner in which narcotics traffickers use telephones, cellular telephone technology, coded communications or slang-filled telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

## USE OF CELLULAR TELEPHONES BY DRUG TRAFFICKERS

8.      Based upon my training and experience, my conversations with other agents, and my participation in this and other drug trafficking investigations, I know the following about the use of cellular telephones by drug traffickers:

a. Individuals involved in drug trafficking often use cellular telephones to communicate with customers and/or co-conspirators via voice calls and text messages. Text messages, voice messages, and records of incoming and outgoing communications are often stored on a drug trafficker's cellular telephones.

b. Individuals involved in drug trafficking often keep cellular telephones and documents referencing the possession of those phones in their residences, automobiles and on their persons.

3

c.  Individuals involved in drug trafficking often use multiple cellular telephones, including individual phones used for particular customers or co-conspirators.

d.  Individuals involved in drug trafficking often use cellular telephones and other digital storage devices to maintain telephone number "contact lists" of customers and/or co-conspirators.

e.  Individuals involved in drug trafficking often carry firearms to protect themselves and their drug proceeds and to enforce drug debts.

f.  Individuals involved in drug trafficking often use the digital cameras on their cellular telephones to take pictures of themselves with their co-conspirators, holding handguns or other weapons, or handling suspected controlled substances or proceeds of drug trafficking.  These pictures are often stored on a drug trafficker's cellular telephone.

g.  Individuals involved in drug trafficking often keep logs of drug debts owed by customers or to suppliers, often referred to as an "owe sheet" or "tally sheet."  These logs can be kept on cellular telephones.  Additionally, individuals involved in drug trafficking may attempt to launder drug proceeds by intermingling them with legitimate funds, evidence of which may be stored electronically on cellular telephones.

## **PROBABLE CAUSE**

9.  Members of the FBI's Baltimore Safe Streets Task Force are investigating criminal activity by rival drug trafficking organizations engaged in a violent feud over a lucrative drug "shop" at the Sunoco gas station[1] located at Baltimore Street and Hilton Avenue in Southwest Baltimore City.  One drug trafficking organization has ties to Abington Avenue, just east of the

---

[1]     During the course of the ongoing feud between these rival gangs, the gas station located at 3300 West Baltimore Street has changed over from being a Sunoco to a Marathon.

4

Sunoco gas station, and the other has ties to Benkert Avenue, just west of the Sunoco gas station. Multiple homicides and shootings have been linked to the turf war between these organizations.

10.     According to CS-1, WEAVER is a violent member of the Abington Avenue organization who carries firearms and is involved in criminal activity including drug trafficking, robbery, and murder.   CS-1 reported that WEAVER and an associate named Dwayne TORRENCE, a/k/a "Rico," were responsible for the July 17, 2017 murder of Maurice Finney, a/k/a "Mitch," and nonfatal shooting of Diamonta Boyd at the Sunoco gas station in the 3300 block of West Baltimore Street, which they carried out in furtherance of their drug trafficking organization.[2] CS-1 also advised investigators that WEAVER was using telephone number (410) 572-7018.

11.     During the week of November 11, 2018, CS-1 placed a call to (410) 572-7018 that was monitored by law enforcement.  During the call, CS-1 made plans to meet WEAVER to discuss a potential "lick," *i.e.*, a robbery opportunity.  Soon after, CS-1 met with WEAVER and recorded a conversation in which they discussed the potential robbery of a drug stash house. Unbeknownst to WEAVER, the robbery opportunity was a fiction; the drug stash house did not exist.  WEAVER agreed to carry out the robbery, and he stated that this was "the same shit" that "me and Jugg been doing."  "Jugg" is known to investigators as Jermaine SUMPTER.  CS-1 knows SUMPTER to be a criminal associate of WEAVER's.  Investigators interpreted WEAVER's comment to mean that he is engaged in an ongoing conspiracy with SUMPTER to commit home invasion robberies of drug stash houses in order to enrich themselves and their drug trafficking organization.

---

[2]     TORRENCE was convicted of the attempted murder of Boyd (among other offenses) in Baltimore City Circuit Court on October 25, 2018 (Case No. 117223006).  As of this writing, WEAVER has not been arrested or charged in connection with the incident.

5

12.     During the recorded conversation, WEAVER also displayed a firearm to CS-1 and talked about owning several firearms, including a "45," a "357," and a "40." While discussing the potential stash house robbery, WEAVER confessed to having killed "Mitch"—*i.e.*, Maurice Finney, who, as discussed above, was murdered in the 3300 block of West Baltimore Street on July 17, 2017. WEAVER proceeded to describe the murder using specific details that are consistent with surveillance footage and other physical evidence recovered during the investigation. For instance, WEAVER explained that he committed the murder with "Rico" (*i.e.*, TORRENCE), that he wore a mask and "skipped down on" the victim (which is corroborated by the surveillance footage), and that he shot the victim once using a "40" (which is corroborated by the physical evidence from the scene). At the conclusion of their conversation, CS-1 promised to contact WEAVER in reference to the robbery opportunity. After the meeting, CS-1 provided the recording of the conversation to investigators.

13.     During the week of November 18, 2018, CS-1 placed a call to (410) 572-7018 and arranged to meet WEAVER in order to further discuss the fictitious robbery opportunity. Following this call, CS-1 provided a "screenshot" of the call log from CS-1's phone to investigators, which showed a completed call with phone number (410) 572-7018.

14.     During the week of January 7, 2019, investigators learned that WEAVER's (410) 572-7018 number was out of service. On January 9, 2019, WEAVER called CS-1 from a different number, (443) 734-5076. CS-1 answered the call and used the speaker function to allow investigators to monitor the call. During the conversation, CS-1 told WEAVER that CS-1 was trying to get information in reference to a robbery they could commit. WEAVER again stated that he wanted to take part in the robbery.

15.     On January 25, 2019, CS-1 made a phone call to WEAVER, in the presence of investigators, for the purpose of arranging a meeting to further discuss the robbery opportunity. CS-1 explained that CS-1 wanted to introduce WEAVER to an associate who was planning the robbery.  Unbeknownst to WEAVER, the associate was an undercover law enforcement officer, UC-1.  WEAVER explained that he was not in the area of the proposed meeting location—St. Agnes Hospital—because he was watching his child at a different location.  WEAVER agreed to meet with CS-1 at that (second) location, and he subsequently sent a text message to CS-1 that provided an address of "2621 claybrook drive."  Investigators believe that 2621 Claybrook Drive is adjacent to the residence of WEAVER's sister, Marquita.  Databases of the Maryland Motor Vehicle Administration show that Marquita Weaver is currently residing at 2619 Claybrooke Drive, Baltimore, Maryland 21244.

16.     Pursuant to WEAVER's instructions, CS-1 and UC-1 traveled to the area of 2621 Claybrook Drive in a vehicle equipped by investigators with an audio-video recording device.  As CS-1 and UC-1 were arriving, CS-1 made a phone call to WEAVER.  WEAVER instructed CS-1 and UC-1 to pull their vehicle around the corner from 2621 Claybrook Drive.  CS-1 and UC-1 did as they were told.

17.     A short time later, WEAVER approached CS-1's and UC's vehicle.  CS-1 briefly exited the vehicle to greet WEAVER.  WEAVER then entered the front passenger seat of the vehicle, and CS-1 sat behind WEAVER.  UC-1 remained in the driver's seat.

18.     After WEAVER entered the vehicle, UC-1 introduced himself as "Shi" and claimed to be a member of a drug trafficking organization that was importing large quantities of heroin into the Baltimore area.  UC-1 claimed that he was responsible for picking up shipments of heroin from designated stash houses and delivering them to "drop" locations.  UC-1 told WEAVER that he

7

was upset with his confederates because they had failed to fully compensate him for his services. He explained that he wanted someone to help him rob an upcoming shipment of heroin from his confederates and that he would be willing to split the stolen heroin with whomever was willing to commit the robbery.

19.    With respect to the logistics of the robbery, UC-1 explained that his confederates used a different stash location for each shipment of heroin that they delivered to the Baltimore area; that his confederates would notify him of the stash location by sending him an address in a text message; and that he was always expected to arrive at the stash location to pick up the shipment of heroin within an hour of receiving the address. UC-1 explained that the same three individuals were always inside the stash location and that two of the individuals always had firearms on their persons when he arrived. UC-1 stated that he typically picked up multiple kilograms of heroin— as many as five at a time—in connection with each shipment. UC-1 further stated that if WEAVER and his associates agreed to commit the robbery, UC-1 would rent a storage unit at a nearby facility, where WEAVER and his associates could meet with UC-1 after the robbery to divide their respective shares of the stolen heroin. UC-1 told WEAVER that if he was interested in committing the robbery, UC-1 wanted to meet with WEAVER and his associates as a group before the robbery took place.

20.    Throughout the conversation, WEAVER repeatedly indicated that he wanted to commit the robbery. For instance, he explained that he had as many as three associates who could help him commit the robbery—"three people to run through that bitch." He stated that he had multiple firearms, including "a big ass chopper and a lot of big 40s." He further claimed that he had recently committed a similar robbery. "I just hit a lick in the city," he explained. "I ran in a nigga house and got like ten thousand and six ounces of coke." WEAVER also told UC-1 that

8

following the robbery, he intended to "bust down," or break down, the kilogram quantities of stolen heroin into smaller components and sell the stolen heroin through his own distributors. He assured UC-1 that "it [*i.e.,* the robbery] ain't gonna come back on you."

21.     Furthermore, at multiple points during the recorded conversation, WEAVER told UC-1 that he intended to kill the individuals who were guarding the stash location after robbing the individuals of their heroin. "Ain't tryin' to leave anybody in that bitch," WEAVER told UC-1. "Nobody coming out of there alive. Fuck no, that'll be stupid. You leave anybody in that bitch alive ... all I gotta do is get in and waste 'em." Similarly, later during the conversation, WEAVER stated, "I gotta kill 'em, right; I can't leave them alone. You get what I'm saying? It's the only thing that gotta happen. Like, they can't be left alive."

22.     At the end of the conversation on January 25, 2019, UC-1 and WEAVER exchanged phone numbers. Eleven days later, on February 5, 2019, WEAVER placed a phone call to UC-1. During the phone call, WEAVER told UC-1 that he was just checking in. WEAVER stated that he had notified his associates of the potential robbery and had told them that UC-1 would soon be coming to Baltimore meet them. UC-1 told WEAVER that he would call him back at a later time.

23.     UC-1 placed a phone call to WEAVER on February 11, 2019. During the call, UC-1 asked WEAVER what he was doing the following day. WEAVER told UC-1 that he would alert his associates so that UC-1 could meet with the associates as a group. UC-1 responded that he would call WEAVER the following day, *i.e.,* February 12, 2019.

24.     On February 12, 2019, UC-1 called WEAVER to arrange a meeting with WEAVER and his associates to further discuss the potential robbery. Later that day, UC-1 met with

WEAVER, BROOKS, and JACKSON at a McDonald's restaurant in West Baltimore. UC-1 wore a recording device to capture his interactions with WEAVER, BROOKS, and JACKSON.

25.     During the meeting, UC-1 stated that he was scheduled to pick up multiple kilograms of heroin the following day, and that he wanted assistance from WEAVER, BROOKS, and JACKSON in taking the heroin. WEAVER, BROOKS, and JACKSON indicated that they were interested in assisting UC-1, and all three asked questions or made observations regarding the logistics of the robbery. For example, JACKSON asked whether there were cameras in the area of the stash house where the robbery was going to take place. He also asked whether one of the individuals in the stash house was going to be "strapped" (*i.e.*, carrying a firearm on his person). Similarly, BROOKS observed that "the biggest problem is getting in," *i.e.*, gaining entry into the stash house. He further ensured UC-1 that "a nigga ain't gonna do nothing that's gonna jeopardize you." At the conclusion of the meeting, WEAVER, BROOKS, and JACKSON agreed to meet with UC-1 at a storage facility in advance of the robbery the following day.

26.     On the morning of February 13, 2019, UC-1 placed a phone call to WEAVER for the purpose of ensuring that WEAVER, BROOKS, and JACKSON were going to meet with UC-1 at the storage facility in advance of the robbery. During the call, WEAVER told UC-1 that he was attempting to procure a rental vehicle that he and his associates could use in connection with the robbery. WEAVER later informed UC-1, however, that he was unable to procure the rental vehicle. Later that morning, WEAVER sent a text message to UC-1 in which he stated, "Yoo it was too much short timing I thought you was going just come meet them and then next time you come down so next time soon as you car I'm going get everything done soon." Minutes later, WEAVER sent two additional text messages to UC-1. In the first, WEAVER stated, "So nothing bad can happen and things go wrong lor more homework try watch them a lor more see who all

10

got rockets." In the second message, WEAVER wrote, "Just not trying rush and then everybody fucked up you feel me." Based on my training, experience, and involvement in this investigation, I believe that in the text messages excerpted above, WEAVER was informing UC-1 that he and his associates were unable to organize themselves for the potential robbery due to "short timing," and that WEAVER wanted more information regarding which of the individuals in the stash house would be armed ("try watch them a lor more see who all got rockets").

27.    On February 19, 2019, UC-1 placed a phone call to WEAVER and notified him that he was returning to the Baltimore area to pick up another shipment of heroin in a couple of weeks. WEAVER responded, "Alright, alright. I'm gonna make sure I get everything ready." UC-1 then offered to procure a rental car for WEAVER and his associates. WEAVER responded, "Alright, bet. That's what's up." Later during the call, WEAVER told UC-1 that he would let him know about the rental car as soon as he had spoken with his associates. Six days later, on February 25, 2019, WEAVER sent a text message to UC-1 in which he stated, "Yoo we got a ride now," indicating that he, BROOKS, and JACKSON would not be needing a rental car because they had successfully procured their own vehicle to use in connection with the robbery.

28.    On or about March 6, 2019, CS-1 informed investigators that approximately two days earlier, WEAVER had contacted CS-1 to discuss the potential robbery. Toll records for CS-1's cell phone show that on March 4, 2019, WEAVER made three calls to CS-1's cell phone, none of which were answered. The records further show that later that day, CS-1 returned WEAVER's call and had a conversation with WEAVER that lasted approximately nine minutes and 55 seconds. CS-1 informed investigators that during the conversation, WEAVER said that the last time he was supposed to commit the home invasion robbery with "Shi" (*i.e.*, UC-1), he had been unable to obtain a vehicle in time to commit the robbery. WEAVER also asked CS-1 how well CS-1 knew

11

"Shi." CS-1 responded that CS-1 knew "Shi" because they had previously worked together at a trucking company and that "Shi" was actively involved in distributing large quantities of heroin. WEAVER asked CS-1 whether CS-1 was a personal friend of "Shi." CS-1 advised that they were not close friends. According to CS-1, WEAVER responded, in substance, that he was glad that CS-1 and "Shi" were not good friends because he was planning on killing CS-1 in the stash house and "leaving him stinking in the house" with the other victims, *i.e.*, the individuals responsible for guarding the drugs in the house. WEAVER further told CS-1 that "Shi" had offered to rent a car for WEAVER and his associates, but that WEAVER did not want to commit the robbery in a car rented by "Shi" if WEAVER and his associates were going to kill him.

29.     On March 6, 2019, UC-1 contacted WEAVER to arrange a meeting with WEAVER and his associates to confirm the logistics of the potential robbery. Later that day, UC-1 met with WEAVER, BROOKS and JACKSON at a McDonald's restaurant in West Baltimore. UC-1 wore a recording device, which UC-1 used to record his interactions with WEAVER, BROOKS, and JACKSON. As UC-1 was arriving at the restaurant, he encountered WEAVER exiting a black four-door Nissan Maxima sedan. UC-1 and WEAVER then entered the restaurant together.

30.     A second BPD undercover officer, UC-2, was conducting covert surveillance of the meeting in order to ensure UC-1's safety. After UC-1 and WEAVER entered the restaurant, UC-2, observed an individual later identified as SUMPTER sitting in the black Nissan Maxima that WEAVER had arrived in. UC-2 later observed SUMPTER entering the restaurant with other individuals, finding a seat, and observing the conversation between UC-1, WEAVER, and WEAVER's associates from a distance.

31.     Inside the restaurant, UC-1 met with WEAVER. WEAVER was later joined by JACKSON and BROOKS. When JACKSON arrived, UC-1 asked whether he (*i.e.*, JACKSON)

12

was still "in this," *i.e.*, the robbery. JACKSON responded, "Yeah, hell yeah. Hell yeah." After BROOKS arrived, UC-1 again discussed the robbery with all three defendants. During the discussion, UC-1 explained that he had wasted his money renting a storage unit in connection with the previous, unexecuted robbery plan on February 13, 2019. JACKSON then stated, "it ain't going to waste this time." Later, when the discussion turned to the logistics of the robbery, WEAVER noted that of the three individuals expected to be guarding the stash house, "the nigga in the back" was "probably the only nigga we gotta be worried about." JACKSON agreed, stating "that's why I think that's the only person we gotta worry about—the nigga that got that shit." WEAVER then discussed his plan to neutralize the three individuals whom he expected to be guarding the stash house. "One nigga grab him at the door," WEAVER said. "One nigga grab the nigga in the middle. The other nigga in back." JACKSON later stated, "We ready. We ready. We already got enough artillery to do what the fuck we said then. We gonna get in there." JACKSON also stated that following the robbery, he and his associates would "drop the three"— that is, they would dilute, or "stretch," the stolen heroin with a cutting agent—before selling it in the streets. Throughout the conversation, BROOKS was listening attentively and nodding his head.

32.     On the morning of March 7, 2019, UC-1 exchanged multiple phone calls and text messages with WEAVER in order to make plans to meet up to commit the robbery. UC-1 arranged to meet WEAVER and his associates in the parking lot of a Royal Farms store near a storage facility in the area of the Horseshoe Casino. At approximately 11:21 a.m., WEAVER, BROOKS, JACKSON and SUMPTER arrived in the parking lot in a black four-door Nissan Maxima sedan. WEAVER then exited the Nissan Maxima and approached UC-1's vehicle. WEAVER greeted UC-1 and explained that his associates were reluctant to accompany UC-1 to the storage facility

in advance of the robbery, as UC-1 had previously proposed. "They ain't trying to go the storage locker," WEAVER said. "They talkin' about why the fuck we gotta ride to the storage locker. They talkin' about he probably [u/i] the police. They ain't trying to whip up in the storage locker and get boxed in and all that goofy shit." UC-1 responded that he wanted to "show them" the locker, so that "they know what the fuck they're doing." WEAVER stated he would try to persuade his associates to accompany him and UC-1 to the storage facility. He then exited UC-1's vehicle and returned to the Nissan Maxima.

33.    Minutes later, WEAVER made a call to UC-1. During the call, WEAVER explained that BROOKS, JACKSON and SUMPTER did not believe they needed to accompany WEAVER and UC-1 to the storage facility. "They say everybody don't gotta know," WEAVER said, "as long as I know it's good." WEAVER then exited the Nissan Maxima, got back into UC-1's vehicle, and rode with UC-1 to the storage facility. As WEAVER and UC-1 were entering the storage facility, UC-1 asked WEAVER, "They still about it [i.e., the robbery], right?" WEAVER responded, "Yeah, they still about it. They just don't want to come to the storage, talking about, the police might be sitting back there, we can't get out."

34.    Upon arriving at the storage facility, WEAVER and UC-1 exited UC-1's vehicle, and UC-1 brought WEAVER up a flight of stairs, where he showed WEAVER and empty storage locker. After viewing the locker, UC-1 and WEAVER returned to UC-1's vehicle. Inside the vehicle, UC-1 told WEAVER, "you could just rock with me," meaning that WEAVER could ride with UC-1 from the storage facility to the stash house where the robbery was to take place. WEAVER initially agreed, but then he stated that he wanted to get back "in the car with them [i.e., BROOKS, JACKSON, and SUMPTER] for real, so I can make sure they good." WEAVER continued: "Like they on some goofy shit, you feel what I'm saying. I need to make sure they head

14

clear, like y'all need to clear that shit up. All that goofy shit y'all doing need to stop now, cause I ain't with all the goofy shit, man. Like go in this motherfucking house and y'all get me shot. I ain't with none of that."

35. Approximately two minutes later, UC-1 exited his vehicle and gave the arrest signal to law enforcement officers who were waiting nearby. Multiple officers then approached the vehicle and placed WEAVER under arrest. During a search of WEAVER's person, the officers recovered a Ruger .357 revolver from the front inside pocket of WEAVER's coat. The revolver bore serial number 17214226 and was loaded with six rounds. The officers also recovered 11 pink-top vials, which field-tested positive for cocaine, from the breast pocket of WEAVER's coat. The officers removed the knit cap that WEAVER was wearing, underneath of which they discovered a mask, which WEAVER was wearing but had pulled down to expose his face. Officers then searched UC-1's vehicle and recovered two black woolen gloves from the floor underneath the passenger seat. The gloves were not inside the vehicle before WEAVER entered the vehicle to accompany UC-1 into the storage facility. Located on the ground where WEAVER was arrested was a black Motorola phone, model XT1921-3 with IMEI 351841094986520 **(SUBJECT DEVICE 1)**.

36. Meanwhile, a second team of law enforcement officers approached the black Nissan Maxima in the Royal Farms parking lot and placed BROOKS, JACKSON, and SUMPTER under arrest. At the time of the arrest, SUMPTER was in the driver's seat of the vehicle, BROOKS was in the rear driver's side seat, and JACKSON was in the rear passenger side seat. During searches incident to arrest, officers recovered black masks from both BROOKS and JACKSON. Both were wearing the masks on their head. Recovered from BROOKS' person was a red iPhone with IMEI: 359498089038718 **(SUBJECT DEVICE 2).** From the glove box, center console, and

15

trunk, the officers recovered paperwork and prescription medication bearing SUMPTER's name. From the floor in front of the rear passenger side seat (where JACKSON had been sitting), the officers recovered a black Keltec 9 millimeter handgun bearing serial number AUY36. The handgun was loaded with 10 rounds, one of which was in the chamber. The officers also recovered a pair of black woolen gloves from the same location. From the floor in front of the rear driver's side seat (where BROOKS had been sitting), the officers recovered one black woolen glove. The officers discovered another black woolen glove on the rear driver's side seat itself. Recovered from the map pocket on the back of the front passenger seat was a ZTE cell phone, model N8185, with serial number 676037061 **(SUBJECT DEVICE 3)**. Recovered on the front passenger's seat was a pink iPhone, model A1662, with IMEI 358633071058719 **(SUBJECT DEVICE 4)**. Recovered from the center console was a black Motorola phone, model XT1921-3 with IMEI: 351841091258568 **(SUBJECT DEVICE 5)**.

37.    After being transported back to the FBI Field Office, agents recovered from JACKSON's person a black and silver iPhone, model A1586, with IMEI 356147092593549 **(SUBJECT DEVICE 6)**.

38.    Following the arrests, FBI agents and task force officers interviewed (or attempted to interview) each of the defendants individually. At the beginning of each interview, the agents and task force officers advised the defendants of their *Miranda* rights. WEAVER and JACKSON both declined to speak with investigators. BROOKS and SUMPTER, by contrast, both waived their *Miranda* rights and provided statements.

39.    During their respective interviews, BROOKS and SUMPTER both attempted to distance themselves from the robbery plot and made a number of false exculpatory statements. BROOKS admitted, however, that he and WEAVER sold drugs together. He also stated that he

16

sold heroin, crack cocaine and fentanyl. He explained that he was a "hitter," *i.e.*, a retail-level drug dealer, and that he sold approximately "400 pills" per day. Asked by investigators about the robbery plan, BROOKS initially stated that he and his associates were planning to take "coke" in connection with the robbery but he later corrected himself and stated that they planned to take heroin. SUMPTER told investigators that he had driven WEAVER to the McDonald's restaurant so that WEAVER could meet with UC-1 on March 6, 2019. With respect to the robbery plan, SUMPTER stated that WEAVER was "basically going to work him or play him [*i.e.*, UC-1]." Asked by investigators to elaborate, SUMPTER stated that WEAVER was going to "like burn him, like work him, see what he got, burn him."

## CONCLUSION

40.     Based on the foregoing, there is probable cause to believe that WEAVER, SUMPTER, BROOKS, and JACKSON committed violations of 21 U.S.C. §§ 841 and 846, and that the **SUBJECT DEVICES** will contain evidence of these violations, as further described in Attachment B.

41.     WHEREFORE, in consideration of the facts presented, I respectfully request that this Court issue a search warrant for the **SUBJECT DEVICES** more fully described in Attachment A, and authorize the search and seizure of the items described in Attachment B.

17

19-1080-SAG

Task Force Officer Mark Neptune
Baltimore Police Department
Federal Bureau of Investigation

Subscribed and sworn to before me this _____ day of March 2019.

The Honorable Stephanie A. Gallagher
United States Magistrate Judge
District of Maryland

18

## **ATTACHMENT A**

### **ITEMS TO BE SEARCHED**

1. One black Motorola phone, model XT1921-3 with IMEI 351841094986520 (**SUBJECT DEVICE 1**), currently located in the custody of the Federal Bureau of Investigation ("FBI") in Baltimore, Maryland.

2. One red iPhone with IMEI: 359498089038718 (**SUBJECT DEVICE 2**), currently located in the custody of the Federal Bureau of Investigation ("FBI") in Baltimore, Maryland.

3. One ZTE cell phone, model N8185, with serial number 676037061 (**SUBJECT DEVICE 3**) currently located in the custody of the Federal Bureau of Investigation ("FBI") in Baltimore, Maryland.

4. One pink iPhone, model A1662, with IMEI 358633071058719 (**SUBJECT DEVICE 4**), currently located in the custody of the Federal Bureau of Investigation ("FBI") in Baltimore, Maryland.

5. One black Motorola phone, model XT1921-3 with IMEI: 351841091258568 (**SUBJECT DEVICE 5**), currently located in the custody of the Federal Bureau of Investigation ("FBI") in Baltimore, Maryland.

6. One black and silver iPhone, model A1586, with IMEI 356147092593549 (**SUBJECT DEVICE 6**), currently located in the custody of the Federal Bureau of Investigation ("FBI") in Baltimore, Maryland.

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

This warrant authorizes the search and seizure of all records contained within the electronic devices described in Attachment A that relate to violations of 21 U.S.C. §§ 841 and 846, by Cortez WEAVER, Jermaine SUMPTER, Kevin BROOKS, and Jamal JACKSON, including, but not limited to:

    a.     images;

    b.     videos;

    c.     records of incoming and outgoing voice communications;

    d.     records of incoming and outgoing text messages;

    e.     the content of incoming and outgoing text messages;

    f.     voicemails;

    g.     e-mails;

    h.     voice recordings;

    i.     contact lists;

    j.     data from third-party applications (including social media applications like Facebook and Instagram and messaging programs like WhatsApp and Snapchat);

    k.     location data;

    l.     browser history;

    m.     bank records, checks, credit card bills, account information, and other financial records;

    n.     evidence of user attribution showing who used or owned the Subject Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

    o.     evidence of software that would allow others to control the Subject Devices, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    p.     evidence of the lack of such malicious software;

    q.     evidence of the attachment to the Devices of other storage devices or similar containers for electronic evidence;

    r.     evidence of counter forensic programs (and associated data) that are designed to eliminate data from the Devices;

    s.     evidence of the times the Subject Devices were used;

    t.     passwords, encryption keys, and other access devices that may be necessary to access the Subject Devices;

    u.     documentation and manuals that may be necessary to access the Subject Devices or to conduct a forensic examination of the Subject Devices;

    v.     contextual information necessary to understand the evidence described in this attachment.

As used above, the term "records" includes all of the foregoing items of evidence in

whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

      a.    surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

      b.    "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

      c.    "scanning" storage areas to discover and possible recover recently deleted files;

      d.    "scanning" storage areas for deliberately hidden files; or

      e.    performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

If after performing these procedures, the directories, files or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file or storage area, shall cease.